AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original



# UNITED STATES DISTRICT COURT

for the

Central District of California



| United States of America | |
|---|---|
| v. | |
| MAURISIO PEREZ; SALVADOR PEREZ; and ADRIEL CONTRERAS, | Case No. 2:25-mj-05193-DUTY |
| Defendants. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of January 15, 2025 to August 22, 2025, in the county of Ventura in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846, 841(a)(1), (b)(1)(A) | Conspiracy to distribute and possess with intent to distribute controlled substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Luis A. Soto-Afante
Complainant's signature

Luis A. Soto-Afante, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 8/22/2025 at 3:40 p.m.

Judge's signature

City and state: Los Angeles, California    Hon. Stephanie Christensen, U.S. Magistrate Judge
*Printed name and title*

AUSA: Nicholas Purcell, x3752

**AFFIDAVIT**

I, Luis A. Soto-Afante, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against, and arrest warrants for, Maurisio Perez ("M. PEREZ"), Adriel Contreras ("CONTRERAS"), and Salvador Perez ("S. PEREZ") for violations of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A) (conspiracy to distribute and possess with intent to distribute controlled substances).

### II. BACKGROUND OF AFFIANT

2. I am currently a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), Los Angeles Field Division, Ventura Resident Office ("VRO") and have been employed in this capacity since May 2023. I am an investigative and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

3. During the course of my employment, I have received comprehensive, formal instruction on such topics as drug identification; money laundering techniques; patterns of drug trafficking; complex conspiracies; the exploitation of narcotics traffickers' telecommunications devices; criminal law; surveillance; and other investigative techniques. I have assisted in investigations into the unlawful importation,

manufacture, possession with intent to distribute, and distribution of narcotics (including cocaine, heroin, and methamphetamine, the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including but not limited to such techniques as surveillance, confidential sources.

### III. STATEMENT OF PROBABLE CAUSE

4. Based on my review of video surveillance footage and photographs, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. Debriefs With DEA Confidential Sources**

5. On or about January 15, 2025, I debriefed DEA a confidential source ("CS-1") about his/her knowledge of M. PEREZ and S. PEREZ's drug trafficking activity.[1] CS-1 told me (in substance and summary):

a. CS-1 became friends with M. PEREZ and S. PEREZ in 2017. As such, M. PEREZ and S. PEREZ (who CS-1 referred to by his nickname, "Chava") trusted CS-1 and invited him/her to take

---

[1] CS-1 became a confidential source following his/her arrest by DEA SAs on approximately May 1, 2024, for possession with intent to distribute approximately ten kilograms of cocaine. CS-1 was cooperating with the DEA Ventura Resident Office ("VRO") in the hope of leniency on impending federal charges, although leniency had not been promised or guaranteed. CS-1 is no longer a confidential source with the DEA. CS-1 has one prior arrest for possession/purchase for sale of a controlled substance, transport/sale of a controlled substance, and shoplifting. CS-1 has provided truthful information to investigators that was subsequently independently corroborated.

part in their drug trafficking activities, starting in approximately 2023;

    b.    During CS-1's time working alongside M. PEREZ and S. PEREZ, CS-1 was mainly tasked with picking up either drugs and/or money from M. PEREZ and S. PEREZ's mother's house in Oxnard, California and transporting those items in him/her car to destinations specified by either M. PEREZ or S. PEREZ;

    c.    M. PEREZ and S. PEREZ store some of the proceeds of their drug trafficking activity at their mother's house in Oxnard;

    d.    S. PEREZ now resides in Mexico and remains involved in drug trafficking alongside M. PEREZ, who still lives in Oxnard; and

    e.    M. PEREZ stores some of the drugs that he receives from S. PEREZ at commercial storage facilities in and around Oxnard.

6.    Then, on or about March 13, 2025, a group of DEA SAs and Ventura County detectives interviewed another DEA confidential source ("CS-2").[2]  During that interview, CS-2 told law enforcement (in substance and summary):

    a.    s/he trafficked drugs alongside various individuals, to include CONTRERAS and an associate he referred to as "Chava;" ;

---

[2] CS-2 became a confidential source for the DEA Los Angeles Office in the hope of leniency for impending federal charges, although such leniency has not been promised or guaranteed. CS-2 has prior arrests for possession of counterfeit currency with the intent to defraud and receiving stolen property. CS-2 has previously provided information to investigators, which has been independently corroborated as accurate and reliable.

b.  s/he communicated with "Chava," (whose first name was "Sal") and CONTRERAS about drug trafficking via the Threema messaging application;

c.  when s/he had coordinated drug transactions with "Chava," (who currently lives in Mexico) "Chava," would send either CONTRERAS, an associate named "Germaine," or a family member to sell drugs to CS-2; and

d.  when CONTRERAS or "Germaine," sold drugs on behalf of "Chava," they would transfer the proceeds of the deals to either "Chava's" brother or sister.

7.  When investigators showed CS-2 a picture of M. PEREZ, CS-2 said s/he believed M. PEREZ was possibly the brother of "Chava."

**A.   Controlled Drug Buy With CONTRERAS**

8.  Following the above-described debrief with CS-2, CS-2's DEA handler instructed CS-2 to set up a drug buy with CONTRERAS and CS-2 complied. On or about March 25, 2025, CS-2 contacted CONTRERAS and initiated a series of conversations that culminated in CONTRERAS agreeing to sell CS-2 a kilogram of cocaine for $11,300 in the parking lot of the Sprouts Market in Camarillo, California (the "Sprouts Parking Lot") on March 26, 2025. During the controlled buy, CONTRERAS and CS-2 discussed CONTRERAS talking to S. PEREZ, including that he would be letting him know that everything went well and that CS-2 would be ready to ship narcotics to New Zealand on behalf of S. PEREZ in the future.

9.  Before the drug deal on March 26, law enforcement established surveillance in and around the Sprouts Parking Lot,

outfitted CS-2 with an audio/visual recording device, and provided CS-2 with $11,300.  Then, CS-2 drove to the Sprouts Parking Lot, parked his/her car, and waited for CONTRERAS to arrive.  At approximately 4:00 pm, members of the law enforcement surveillance team saw CONTRERAS drive his white (at the time) Chevrolet truck (the "Chevrolet") into the Sprouts Parking Lot and park near CS-2's car.  After CONTRERAS parked, members of the surveillance team saw CONTRERAS exit the Chevrolet holding a brown paper package and enter the front passenger seat of CS-2's car.  Approximately ten minutes later, CONTRERAS exited CS-2's car emptyhanded, entered the Chevrolet, and drove away.

    10.  After CONTRERAS departed the Sprouts Parking Lot, CS-2 drove back to a prearranged meeting location and met with DEA SAs.  According to CS-2, when he/she met with CONTRERAS, CONTRERAS handed him a brick-shaped object wrapped in paper and told CS-2 that it was high-quality cocaine.  When the DEA SA's seized that bricked shaped object, they saw that it contained a subject that appeared to be cocaine.  Later, the DEA SAs caused that suspected cocaine to be shipped to the DEA Southwest Laboratory (the "Southwest Lab").  On or about April 23, 2025, the Southwest Lab produced a report that said the suspected cocaine, was, in fact, 1007.1 grams of cocaine.

    B.    **CONTRERAS and M. PEREZ Meet After the Drug Deal with CS-2**

    11.  As CONTRERAS drove away from the Sprouts Parking Lot, members of the investigative team followed him.  At approximately 5:10 pm, CONTRERAS parked the Chevrolet in front of what appeared

to be his home in Oxnard. Approximately 20 minutes later, members of the surveillance team saw CONTRERAS exit his home, re-enter the Chevrolet, and drive away. The law enforcement team followed and watched as CONTRERAS drove a circuitous route (consistent with engaging in countersurveillance) to a Popeye's restaurant on Ventura Road, where he arrived at approximately 6:20 pm, parked the Chevrolet in the parking lot of the restaurant, and remained inside.

12. Approximately five minutes after CONTRERAS parked the Chevrolet, members of the surveillance team saw a black Alfa Romeo (the "Alfa Romeo") enter the Popeye's parking lot and park near CONTRERAS. Then, the surveillance team saw M. PEREZ exit from the front passenger seat of the Alfa Romeo and approach CONTRERAS, who had exited the Chevrolet. After M. PEREZ and CONTRERAS appeared to greet one another, members of the surveillance team saw CONTRERAS hand M. PEREZ a large stack of dollars and M. PEREZ re-enter the Alfa Romeo with the dollars.

13. The Alfa Romero drove away from the Popeye's and law enforcement maintained surveillance of the car. At approximately 6:30 pm, the Alfa Romeo arrived at what appeared to be M. PEREZ's home in Oxnard and park. Then, members of the surveillance team watched M. PEREZ exit the Alfa Romeo with an "Aldi" brand bag in his hand, enter a black Dodge Challenger (the "Challenger"), and drive away. Law enforcement followed the Challenger to the parking lot of a Goodwill store in Camarillo. There, M. PEREZ met with another individual (later identified as A.G.) who took possession of the Aldi bag from M. PEREZ. Later, investigators

watched as A.G. drove with the Aldi bag to an office park in Camarillo, enter an office in the complex with the Aldi bag in his hand, and exit a short time later emptyhanded. In my training and experience, I believe CONTRERAS delivered the proceeds of the drug deal with CS-2, who then delivered them to M. PEREZ, who then delivered them to A.G., who then stored the cash in the office in Camarillo.

    **C.    Call Between CONTRERAS, S. PEREZ, and CS-2**

14. On April 2, 2025, CS-2's DEA handler instructed CS-2 to place a recorded phone call to CONTRERAS and CS-2 complied. Initially, CS-2 connected with CONTRERAS via Signal. Then CONTRERAS transitioned the call from a two-way call with CS-2 on Signal to a three-way call on Threema between CONTRERAS, CS-2, and "Chava," (who I believe, based in part on the above-described information to be S. PEREZ).

15. During one of CS-2's debriefs with law enforcement, CS-2 described how he helped S. PEREZ ship methamphetamine and cocaine from Mexico to New Zealand. In substance and summary, CS-2 described how S. PEREZ shipped drugs from Mexico to CS-2 in the United States, followed by CS-2 shipping those drugs on behalf of S. PEREZ to New Zealand. According to CS-2, these efforts had involved approximately 20 kilograms of cocaine and 40 pounds of methamphetamine. During that three-way call, CONTRERAS, S. PEREZ, and CS-2 discussed that arrangement in more detail:

   a. S. PEREZ told CS-2 and CONTRERAS, "we have people in the inside [in New Zealand] knowing about the shipment … [who have] power to pull it out without going through customs;" and

   b. S. PEREZ told CS-2 and CONTRERAS that his preferred international shipper "has to be DHL … because we have better control in DHL [than with other shippers]."

 16. As the three-way call progressed, CONTRERAS, CS-2, and S. PEREZ discussed plans for shipping larger amounts of drugs from Mexico, through the United States, to New Zealand.  In substance and summary, S. PEREZ told CONTRERAS and CS-2:

   a. they would need to take extra precautions when shipping larger amounts of drugs to New Zealand since he believed that law enforcement had saturated California; and

   b. S. PEREZ would need to ship the drugs to a "legitimate" warehouse in a different state where the drugs could be disguised alongside $30,000 to $40,0000 worth of "legitimate machinery" before being shipped to New Zealand.

 **D.** **Seizure of Cocaine from M. PEREZ's Storage Unit in Oxnard**

 17. On May 5, 2025, Oxnard Police Department received a call about property found in a storage unit at Golden State Storage located at 2100 Auto Center Drive, in Oxnard.  Employees of Golden State Storage had located a locked storage unit ("Unit D13"), that was supposed to be unoccupied.  Golden State Storage staff cut the lock and found what appeared to be multiple kilograms of drugs.

18. Detectives responded to the location to conduct a follow-up investigation regarding the presumed drugs. Once at the storage unit, law enforcement used the TruNarc Narcotics Analyzer to test the drugs. The narcotics tested presumptively positive for cocaine. On or about July 11, 2025, the Southwest Lab produced a report that said the suspected cocaine, was, in fact, 2,703.2 grams of cocaine. Additionally, law enforcement opened one of the wrapped kilograms of cocaine to reveal the pressed stamp. Drug trafficking organizations, also known as cartels, place stamps on their product to signify ownership, quality, and as a marketing tool. The stamp on one of the kilograms of cocaine was "KM." Law enforcement is aware from information provided by CS-2 that S. PEREZ and M. PEREZ are in possession of bulk quantity kilograms of cocaine stamped with "KM." Based on the stamp, investigators and law enforcement believed the cocaine likely belonged to S. PEREZ and M. PEREZ.

19. On April 25, 2025, M. PEREZ completed paperwork at the Golden Gate Storage location, which was confirmed by video surveillance footage and the California Driver's license provided by M. PEREZ. Once the paperwork was completed, a staff member accidentally led M. PEREZ to Unit D13, when in fact M. PEREZ had been assigned storage unit was D35. At the time, Unit D13 was empty.

20. On April 29, 2025, at approximately 6:19 pm, video and electronic surveillance showed M. PEREZ enter the Golden Gate Storage location in the Alfa Romeo. M. PEREZ used the unique key code (*508027) he had been assigned to enter the location. The Alfa Romeo drove to Unit D13, and M. PEREZ exited the front

passenger seat and walked toward Unit D13. Approximately one minute later, M. PEREZ walked back into view from the direction of Unit D13, got back in the passenger seat of the Alfa Romeo, and exited the location.

21. Electronic and video surveillance showed M. PEREZ accessing the Golden Gate Storage location with his unique key code and driving to Unit D13 on May 1, 2025; May 3, 2025; and May 7, 2025 (two days after law enforcement seized the drugs in Unit D13).

22. After leaving Golden Gate Storage on May 7 in the Alfa Romeo, M. PEREZ drove to the area of 2860 E. Vineyard Ave., in Oxnard, as confirmed by a tracking device. The Alfa Romeo arrived at the location at approximately 6:06 pm. CONTRERAS was also at that location at that time, as shown by GPS telephone pings and the tracker on his car.

23. Shortly after, law enforcement tracked CONTRERAS's Chevrolet to the Golden Gate Storage location. They observed while CONTRERAS used M. PEREZ's unique key code to enter the location. CONTRERAS took a photograph of Unit D35 before leaving.

24. Additionally, on May 8, 2025, a caller identifying himself as M. PEREZ called the Golden Gate Storage location and claimed the items in his storage unit were stolen and accused the Golden Gate Storage unit staff of stealing his belongings. The manager told law enforcement that M. PEREZ sounded very upset and would not identify the types of items that were missing.

25. Based on my knowledge of this investigation and my training and experience, I believe the cocaine located in Unit D13 belonged and was being trafficked by M. PEREZ and his

coconspirators.  Furthermore, I believe that once he became aware that his cocaine was no longer in Unit D13, M. PEREZ sent CONTRERAS to Golden Gate Storage to confirm and further investigate the missing cocaine.

26.  Based on my training and experience, it is common for traffickers of large quantities of drugs to store them in storage units instead of their residences.  It is highly likely that organization run by S. PEREZ and M. PEREZ use multiple storage units throughout Ventura County to store bulk quantity narcotics.

## IV.  CONCLUSION

27.  For all the reasons described above, there is probable cause to believe that S. PEREZ, M. PEREZ, and CONTRERAS violated 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A) (conspiracy to distribute and possess with intent to distribute controlled substances).

/s/
Luis A. Soto-Afante, Special Agent, DEA

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 22nd day of August, 2025.

HONORABLE STEPHANIE CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE